No. 1685.
Second Circuit Appeal.

POWELL-MYERS LUMBER CO., ET AL., v. TREMONT & GULF RAILWAY CO.

(Oct. 31, 1924, Rehearing Denied.)

(*Syllabus by the Editor.*)

1. Louisiana Digest—Carriers of Passengers and Goods—Par. 123, 137.

Article 2754 of the Civil Code provides that "Carriers and Watermen are liable for the loss or damage of the things entrusted to their care, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events".

2. Louisiana Digest—Pleading—Par. 62.

An exception no cause of action in a suit for damages to a shipment based on the allegation that the railroad, at the time of the shipment, had no control over the operation of its road because the United States was at war with Germany and had taken over the operation of all railroads will be overruled.

3. Louisiana Digest—Evidence—Par. 13, 18, 21.

The court takes judicial cognizance of Acts of Congress, Presidential Proclamations, and Orders of the Director General of Railroads.

4. Louisiana Digest—Evidence—Par. 96, 99, 106.

A certificate of the Chief Clerk and Custodian of the Records of the United States Railroad Administration is not the best evidence, and therefore is not admissible. The records are the best evidence.

5. Louisiana Digest—Evidence—Par. 96, 99, 106.

A certificate of the Clerk of Court is not the best evidence, and therefore not admissible. The records are the best evidence.

6. Louisiana Digest—Evidence Par. 349.

The inference from the proof that there was a technical or constructive control by the United States Railroad Administration over a railroad is not sufficient to fix the liability for damage to a shipment of goods on the Railroad Administration.

7. **Louisiana Digest—Carriers of Passengers and Goods—Par. 134.**

In a suit to recocer damage to a shipment of goods it is not necessary fort he plaintiff to allege the special giving of notice of facts necessarily disclosed by an inspection of the shipment made by defendant's agent when the consignment was received from plaintiff.

8. **Louisiana Digest—Carriers of Passengers and Goods—Par. 132.**

Where the officers and agents of a Railroad Company know about conditions which would likely delay the shipments of goods, and did not advise the plaintiff of them until the shipment had been received and forwarded, the defendant can not use as a defense the fact that the car might have been delayed for war embargoes and hold orders of the United States Railroad Administration.

Appealed from the Fifth District Court, Parish of Winn, Hon. Cas Moss, Judge.

This is a suit to recover damages to a carload of green-white oak rim billets, shipped by plaintiff, over defendant's railroad. There was judgment for plaintiff, and defendant appealed.

Judgment affirmed.

Porter & Lyons, of Winnfield, attorneys for plaintiff, appellee.

R. W. Oglesby, of Winnfield, and Theus, Stubbs, Grisham and Thompson, of Monroe, attorneys for defendant, appellant.

ROBERTS, J. Originally this suit was filed by both the Mansfield Hardwood Lumber Co., consignor, and the Powell-Myers Lumber Co., consignee. However, a motion to elect having been filed by the defendant, was sustained, and plaintiffs elected to prosecute their demand under the name of the consignor, Mansfield Hardwood Lumber Company.

The pleadings are well and clearly stated in the brief filed by plaintiffs' counsel, from which we quote:

## STATEMENT OF THE CASE.

"Plaintiff, appellee herein, seeks to recover the sum of $611.47, from the defendant, for damages to a carload of green white oak rim billets, shipped by plaintiff over defendant's railroad.

"Plaintiff alleges in its petition that it delivered to the defendant, a common carrier, at Winnfield, Winn Parish, Louisiana, for transportation to the Powell-Myers Lumber Company, at Argos, Indiana, on February 12, 1918, a carload of green white oak rim billets, valued at the sum of $1,121.10, which shipment was accepted by defendant, and who issued a through bill of lading therefor, bearing the date, February 12, 1918; that said carload of material was freshly cut, properly manufactured stock, free from defect, stain and windshake, and was carefully loaded by plaintiff into defendant's car, so that when the car was closed and billed out, said material was in good condition.

"It is alleged that said billets were shipped green, so that they could be easily bent and properly employed in making rims for U. S. Artillery wheels.

"It is further alleged that said shipment was not delivered to the consignee till on or about April 17, 1918, or over two months from the time of delivery for transportation to defendant; that, when the car was placed for unloading at Argos, Indiana, its contents were found to be in a very badly damaged condition, and that by cutting the billets down to smaller sizes, a part of the shipment was salvaged and damages thus minimized, saving from said car material valued at $509.63, making the total loss suffered the sum of $611.47.

"It is alleged that this damage resulted and was caused by unreasonable, uncalled for and inexcusable delay in transit, caused and brought about by the defendant and the common carriers, railroads, and transportation companies to which defendant delivered said shipment, and over whose lines said shipment moved and passed on its way to its destination, and by reason of the failure of the defendant in its duty and obligation to plaintiff, it should be compelled to pay plaintiff the amount of damage suffered thereby.

"Defendant first appeared and accepted to plaintiff's petition on the ground that there was a misjoinder of parties plaintiff, since the suit was brought in the names of consignee and consignor, which excep-

tion was sustained, and plaintiff amended in accordance with its order, taking a nonsuit as to the Powell-Myers Lumber Co., and making plaintiff sole and only party plaintiff.

"Defendant then appeared and filed an exception of no right of action, averring that on the date of said shipment, viz., February 12, 1918, its railroad and equipment and the property of defendant had been taken over by the United States Government and the President's proclamation issued under the authority therein contained, and that on the date thereof, defendant had no authority, control or domination over its railroad and properties, but on the contrary, the same was being operated and controlled exclusively and solely by the Director General of Railroads, averring that any cause of action that might have arisen by reason of such operation is a cause of action against the United States Government and the Director General of Railroads under Federal control, and not against the defendant. The exception was referred to the merits and later over-ruled.

"The defendant then answered the petition, making a general denial of any liability; denied that it had ever received the shipment in question for transportation; that it ever issued a through bill of lading therefor, and in the alternative answered that in event it was held that it received and accepted said shipment for transportation, that it had no notice that such shipment was intended for any special purpose, or that said lumber was green and required transportation to be effected and delivery to the consignee made within a given period, or that any special or unusual damage would accrue to the same in event of failure to transport and deliver said shipment promptly, and if said shipment was of a special nature intended to receive special care and to be delivered promptly, defendant was entitled to notice of such condition and without such notice, it cannot be held liable for any damage as herein alleged upon; that the delay in this case, in event any is found to have occurred, was due to conditions over which it had no control and for which it was not responsible, neither it nor its connecting carriers being able to prevent such delay, for the reason that whatever delay was occasioned was due to embargoes laid upon shipping and especially upon this particular car by the United States Government, made neces-sary by the United States being in a state of war with the Imperial German Government, under Act of Congress, and the executive order of the President, and that the Government in pursuance of its powers under Federal control in cases and times of war, had taken over the control, operation and administration of railroads, including defendant's, and had taken entirely the management and handling of shipments thereover and thereupon out of the power and control of defendant, or its connecting carriers, and if any delay was occasioned, it was due solely and only to the delay made necessary by the exercise of such Governmental control and its proper judgment and discretion, and comes within the section of the bill of lading relieving the carrier from liability for any delays or damage caused thereby."

## OPINION

Without reviewing the testimony in detail, it shows that plaintiff delivered to defendant at Winnfield, La., on February 12, 1918, a carload of white oak rim billets, consisting of 162 pieces of the dimensions and value alleged in its petition. That this carload of material was freshly cut from green logs, especially selected for this shipment. That the billets were shipped green, so that they could be easily bent into the shapes needed to make U. S. Artillery wheels. It is further shown that the billets were free from defect, and were properly loaded into the box car by plaintiff, the layers being separated from each other by strips laid between them, and proper ventilation insured by nailing strips across the door of the car.

Mr. Meek, local manager of plaintiff Company, testified that a cattle car would have been more suitable, because of being better ventilated, but that such a car was not obtainable on defendant's line.

Mr. C. L. Pace, defendant agent at Winnfield at the time the shipment was made, testified that he knew the billets were green, and therefore required prompt transportation and delivery.

The shipment in question, along with several others of the same character consigned to the Powell-Myers Lumber Co., at Argos, Indiana, was made under authority of a Government permit, which the plaintiff had obtained.

The bill of lading under which the shipment was made was issued by Mr. C. L. Pace, defendant's agent at Winnfield, and bears the notation, "Government Purchase Order C-110".

The waybill which accompanied the shipment was also issued by Mr. Pace, defendant's agent, but what instructions or information, if any, relative to the preferential character of the shipment, and the necessity for prompt transportation, was given, is not shown.

The shipment did not arrive at Argos, Indiana, until April 3, 1918; was placed for delivery on April 4th, and actually unloaded on April 5th.

The nature and extent of damage suffered by the shipment are shown in detail by the testimony of Mr. James Sanderson, Superintendent of the unloading and receiving department of the Powell-Myers Lumber Company's bending plant at Argos, Indiana, and also the testimony of Mr. W. M. Murry, who, at the request of the consignee, went to Argos, Indiana, and made an examination into the damaged condition of the shipment.

The testimony of Mr. Sanderson also shows that the damage was minimized to the best advantage possible, by cutting down the billets to smaller sizes, thus getting rid of the cracks, checks and other blemishes which had developed in the billets by reason of the long delay intervening between the date of shipment and the date of delivery.

It is clear from the testimony that plaintiff sustained damage in the amount allowed by the District Court, and that the damage to the shipment was caused by the delays encountered by the shipment in its journey from Winnfield, La., to Argos, Indiana, and it therefore follows that the questions to be determined are as to whether any of the defenses urged will relieve defendant of the liability for the damage.

## 1st.  THE EXCEPTION OF NO CAUSE OF ACTION.

This exception is based on the contention that on February 12, 1918, the date of the shipment, that defendant had no control over the operation of its line of railroad by reason of the fact that the United States Government, by Act of Congress, and by proclamation of the President of the United States, in the prosecution of the war against Germany, had taken over the operation and control of all railroads, including that of the defendant, located in the Continental United States; that same were, at the time of the shipment, under the operation and control of the Director General of Railroads, and that any action which might have arisen under said operation, was against the United States and the Director General of Railroads, and not against the defendant.

This court, of course, takes judicial cognizance of the Act of Congress passed on August 29, 1916, "empowering the President, in time of war, to take possession, through the Secretary of War, and assume control, of any system or systems of transportation, or any part thereof, and to utilize the same to the exclusion, as far as may be necessary, of all other traffic thereon, for the transportation of troops, war material or equipment, or for such other purposes connected with the emergency as may be needful or desirable."

The Court will also take judicial notice of the proclamation issued by the President, under the above mentioned authority, on December 26, 1917, in which he took con-

trol, effective at 12 o'clock noon, on the 28th day of December, 1917, of all railroads and other systems of transportation located wholly or in part within the boundaries of the Continental United States.

The court will also take judicial notice of General Order No. 50, issued by the Director General of Railroads, on October 28, 1918, "directing that all actions in law or equity, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad system of transportation by the Director General of Railroads, which action, suit or proceeding but for Federal . control might have been brought against the carrier, shall be brought against the Director General of Railroads and not otherwise."

The defendant also offered in evidence in support of · the exception, a letter from John Barton Payne, General Counsel, addressed to Mr. J. S. Joyce, President of the Tremont & Gulf Railway Company, which letter reads as follows:

"June 29, 1918.
Dear Sir:

Pursuant to the policy of the Regional Director, the Tremont & Gulf Railway Company is relinquished from Federal control.

It will be the policy of the Railroad administration to co-operate with relinquished roads as to a fair division of joint rates, car supply, and, as far as may be consistent with the national needs, that there be no undue discrimination as to routing.

If you feel that hardship may result from relinquishment, and .desire to. make a contract on fair terms, right is reserved to consider the advisability of making such a contract.

Very truly yours,

(Signed)   JOHN BARTON PAYNE.

The above letter, or order of relinquishment, was objected to by plaintiff's counsel as being hearsay, but was admitted by the trial court, and properly so, we think, as it appears to be the original, and only such

order delivered to the President of defendant's line.

Plaintiffs, in order to prove that defendant's line was never under actual Federal control, offered in evidence a certificate to that effect, under seal of the United States Railroad administration, signed by the Chief Clerk and Custodian of the records and files .of the United States Railroad administration. This certificate was objected to by defendant's counsel as being hearsay, not the best evidence, and on the further ground that this document was merely an affidavit of the witness concerning which defendant had no opportunity for cross-examination. The objection was over-ruled, and the certificate admitted.

The objection made should have been sustained. Facts shown oy the files of the Railroad administration would have been the best evidence, and the iule would have been stretched far enough in permitting the witness to testify subject to cross-examination as to facts shown by the files of the ·Railroad administration. Even the Secretary of State is not permitted to show facts disclosed by the records of his office by certificate, but must testify to them subject to the same rules applying to other witnesses. Neither is the certificate of a Clerk of Court admissible in evidence. See Jones on Evidence, page 542, and numerous authorities there cited.

The testimony, however, of Mr. C. L. Pace, defendant's agent at Winnfield, shows that there was no actual control exercised over defendant's line up to the time he severed his connection with same, which was subsequent to the time of the shipment in question. And there is no proof anywhere in the record that the United States Railroad administration ever exercised any actual control, or ever operated or took charge of defendant's line of railroad. The most that can be inferred from the proof in the record is that there was a technical

or constructive control of defendant's line existing at the time the consignment in question was made, and this, in our opinion, would not be sufficient to fix liability upon the Railroad administration, nor to relieve the defendant from liability, if shown otherwise to be liable.

We must, therefore, hold that the trial Court properly overruled the exception of no cause or right of action.

## ON THE MERITS

On the merits, the first defense is that there was "no notice in the bill of lading to put defendant on its guard about the character of the shipment, and no allegation of any notice, so as to admit proof."

It is true that the bill of lading designates the shipment as "Hardwood Lumber", and does not specifically describe it as consisting of "Green Hardwood Strips". However, the agent testified that he knew the character of the shipment, and if any further notice to connecting carrier was required as to the nature of the shipment and the necessity for prompt movement, it would seem that those facts should have been noted in the waybill which accompanied the shipment.

The waybill was, no doubt, prepared by defendant's agent, but as defendant did not see fit to offer the waybill in evidence, we have no way of knowing whether it conveyed to intermediate carriers the information which defendant, through its agent, at the point of origin, possessed concerning the shipment.

The petition fully describes the nature of the shipment, and we do not appreciate that there was any necessity for the plaintiff to allege the special giving of notice of facts necessarily disclosed by the inspection of the shipment made by defendant's agent when the consignment was received from plaintiff.

The remaining defense is that "If there was a delay, the same was caused by circumstances over which neither defendant nor its connecting carriers had any control."

From February 12th to April 3rd was, as defendant contends, a period during which the United States Government was exercising the most feverish activity in its efforts to get an army into France, in order to aid the sorely pressed British and French armies in their efforts to check the great German spring offensive which was impending, if it had not already started.

According to the testimony of Mr. Tugwell, who had charge of freight shipments for the defendant, and was perhaps the best qualified of any of the witnesses to testify in detail as to the cause or causes of the delays encountered by the shipment in question, the shipment left Winnfield on February 13th, and was delivered to the Missouri Pacific at Rochelle on February 14th. It remained at Rochelle until February 19th, on account of embargo, when it went to Monroe, where the shipment remained until March 11th. From Monroe, the shipment moved to McGehee, Arkansas, where it remained from March 14th to March 24th. The next movement was to Dupo, Illinois, where it arrived on March 27th, thence to Kokomo, where it arrived April 2nd, and from Kokomo to Argos, where it arrived April 3rd.

Mr. Tugwell testified:

"Q. Then from your investigation, what caused the delays?
A. Well, the embargoes at most of the points, and not only the embargoes at Monroe but a general hold order which lasted from January 19th to March 24th, to hold all freight against the Memphis division.
Q. You don't have charge of the freight shipments, do you?
A. You betcha.
Q. You knew about this general hold letter (order)?
A. Yes, sir."

Mr. Eugene Ford, Vice-President and General Manager of defendant Company, testified that the delay in this shipment could have been caused by embargoes, congested condition of traffic at terminal points, bad weather conditions, or that the car might have been in bad order, and delayed for repairs.

While it appears quite likely that the car might have been delayed by embargoes and by the hold order against the Memphis division during this period, the matter is not made certain enough in our opinion to avail the defendant as a defense in this case, especially in view of the fact that defendant's officers and agents knew about these conditions, and did not advise the plaintiff of them until after the shipment had been received and forwarded.

Mr. C. A. Meek, at the time general manager of the plaintiff's plant at Winnfield, testified in part:

"Q. Mr. Meek, did the agent of the Tremont & Gulf Railway Company notify the Mansfield Hardwood Lumber Company, or the Powell-Myers Lumber Company, that there was an embargo on the road that caused the delay?

A. Not until after they received the shipment.

Q. Did they advise you or inform you of the general hold order from January 19th to March 24th?

A. No, sir.

Q. Did they make any declarations or give any information that this shipment would be delayed in transit?

A. No, sir."

The shipment in question was preferential in character, being shipped under a Government permit, and in the absence from the record of the waybill which accompanied the shipment, the Court has no way of being sure that the various delays encountered would have occurred, had the waybill shown the perishable nature of this shipment, which was to be used in the manufacture of artillery wheels for the United States Government. If the defendant Company knew that the shipment might be delayed, why did it not so inform the plaintiff? Other similar shipments made along about this time, made the journey in from two to three weeks, which, barring unusual delays, the testimony shows was about the time that should have been sufficient for transportation and delivery.

"Carriers and watermen are liable for the loss or damage of the things intrusted to their care, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events." C. C. 2754.

In the case of Lehman Stern & Co. vs. Morgan's Louisiana & Texas Railroad and Steamship Company, 115 La. 1, 38 South. 873, it was held that the carrier must show exactly how the loss resulted from accidental and uncontrollable events.

Not only has that not been satisfactorily done in this case, but assuming that it had been shown, it is doubtful whether it would be a good defense for the reason that the carrier received the shipment, knowing it probably would be delayed, but withheld that information from the shipper, who, had he known of the embargoes and hold order, and that same would be applied to the shipment in question, might have withheld the shipment.

For the reasons given, the judgment of the District Court is hereby affirmed.