154 So.2d 450 (1963)
Carlos Manuel THEYE Y AJURIA, Plaintiff-Appellee,
v.
PAN AMERICAN LIFE INSURANCE CO., Defendant-Appellant.
No. 771.
Court of Appeal of Louisiana, Fourth Circuit.
June 14, 1963.
Rehearing Denied July 1, 1963.
*451 G. Frank Purvis, Jr., Solomon S. Goldman, Matthew Sutherland, New Orleans, for defendant-appellant.
Chaffe, McCall, Phillips, Burke & Hopkins, James G. Burke, Jr., New Orleans, for plaintiff-appellee.
Before JOHNSON, EDWARDS and DALFERES, JJ.
A. WILMOT DALFERES, Judge ad hoc.
Plaintiff, a Cuban National born in Cuba, applied to Pan American Life Insurance Company for a policy of life insurance in Havana, Cuba, through the Havana representative of defendant insurance company in May of 1928. For several years prior to the issuing date of this policy, defendant was authorized to do business in the Republic of Cuba, after complying with Cuban statutory regulations pertaining to the insurance field.
Plaintiff's application was in due course referred to the Home Office of defendant in New Orleans, Louisiana. Upon approval of the application, the policy in regular form, written in the Spanish language, was forwarded to the Havana agent of defendant who, after having it countersigned by an agency of the Cuban government, delivered same to the plaintiff. The plaintiff paid to defendant fourteen annual installments on the policy and in the year 1942 selected, as one of the alternatives in the policy provisions, to have the policy converted to a paid-up policy.
A payment known as a "persistency bonus" became due under the policy in 1948.
In 1948, the Cuban government adopted Law No. 13, which provided that after 1951 United States currency might no longer be used in Cuba, and the Cuban peso would become the sole form of legal tender there. By the Monetary Law of Cuba of 1951, all contracts payable to or by Cuban Nationals were required to be paid in Cuban pesos only.
In November of 1948, in May of 1950, and in February of 1952, the plaintiff made loans against the policy in varied amounts and in each instance the proceeds of such loan in pesos were paid to plaintiff by a check drawn on the Havana, Cuba, office of the National City Bank of New York. Each of such loans to defendant company was repaid by plaintiff, who likewise made the payment in Cuban pesos. All the payments were made in Cuba to defendant's Cuban agent and deposited in a Cuban bank.
In January of 1959, the Castro government came into power after a revolution. The government of the United States recognized and maintained diplomatic relations with the Cuban government until about October 26, 1960.
From 1928, the date of the issuance of the policy in controversy, until some date subsequent to the date of the nationalization of respondent insurance company, plaintiff continued to live in Cuba as a Cuban National.
Subsequent to the nationalization of respondent's business, plaintiff left Cuba and is now a refugee in the United States. Upon his arrival in the United States, he appeared at the office of defendant's company in New Orleans and demanded the cash surrender value of the policy. Upon the refusal of defendant to pay the same, this action followed.
This matter was submitted to the Court for summary judgment on admissions, interrogatories, and stipulation.
*452 The trial Court rendered judgment in favor of plaintiff and against defendant in the amount of SEVEN THOUSAND NINETY AND NO/100 ($7090.00) DOLLARS. From this judgment defendant has appealed.
It is elementary law that a sovereign government, having a definite interest in insurance contracts, can enact legislation for the protection of its citizens, controlling the insurance business within its bounds.[1] As the United States Supreme Court said in Osborn v. Ozlin, 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074,
"The state may fix insurance rates, German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189; it may regulate the compensation of agents, O'Gorman & Young v. Hartford Ins. Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A. L.R. 1163; it may curtail drastically the area of free contract, National Union Fire Ins. Co. v. Wanberg, 260 U.S. 71, 43 S.Ct. 32, 67 L.Ed. 136. States have controlled the expenses of insurance companies, New York Insurance Law, Consolidated Laws of New York, c. 28, § 244, and Wisconsin Statutes, § 201.21; and see Report of Joint (Armstrong) Insurance Investigation Committee (N.Y.) pp. 403-418 (1906). They have also promoted insurance through savings banks; see Berman, the Massachusetts System of Savings Bank Life Insurance, Bulletin No. 615, U.S. Bureau of Labor Statistics, and New York Laws of 1938, c. 471. In the light of all these exertions of state power it does not seem possible to doubt that the state could, if it chose, go into the insurance business, just as it can operate warehouses, flour mills, and other business ventures, Green v. Frazier, 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878, or might take `the whole business of banking under its control.'"
Our learned brother, the trial Court, resolved the issues as follows:
"The Court is of the opinion that any laws or decrees of the Republic of Cuba passed subsequently to the date upon which the policy became a paid-up policy of insurance could have no effect upon the obligation which existed at that time.[2] Said obligation continued from that date to now to be an obligation under the laws of the State of Louisiana and subject to and governed only by said law, if the beneficiary or the insured under said policy presented himself in the State of Louisiana to enforce the obligations contained therein."
It must be remembered that plaintiff is a Cuban National. It is a well established principle of law, recognized by all appellate Court decisions, that a recognized Sovereign Nation can make laws binding upon its nationals within its bounds. Chief Justice Marshall, in The Antelope, 10 Wheat. 66, 6 L.Ed. 268, said:
"No principle of general law is more universally acknowledged than the perfect equality of Nations. Russia and Geneva have equal rights. It results from this equality that no one can rightfully impose a rule on another. Each legislates for itself, but its legislation can operate on itself alone * * *."
When Castro rose to power, his government was recognized by the United States of America. Diplomatic relations were maintained between the United States and Cuba, until October 26, 1960. Plaintiff did *453 not leave Cuba until November 4, 1960. On September 29, 1959, following Castro's rise to power, Law 568 was promulgated. That law prohibited Corporations doing business in Cuba, from making payments, or even making any entries in their books which would result in credit being made available to Cuban Nationals, except in Cuba, and without express authorization of the National Bank of Cuba. Violators of said law were subject to criminal penalties.
Further, on October 24, 1960, all of the affairs and assets of Pan American Life Insurance Company in Cuba were nationalized. The investments, properties and reserves of the said Company were taken over by the Cuban Government, which substituted itself as insurer and assumed all liabilities of the Company; in fact, the business of the Company was carried on through a government appointed administrator.
Certainly any Sovereign Nation can and has the power to change the situs of its National's contracts. Further, a nation can and does frequently impair the obligations of contract. Even our own country did this in the Gold Clause Cases, Norman v. Baltimore & O. R. Co., Nortz v. United States, Perry v. United States, 294 U.S. 240, 317, 330, 55 S.Ct. 407, 428, 432, 79 L.Ed. 885, 905, 912. We do have a provision in the United States Constitution preventing the States of the Union from enacting ex post facto law or laws impairing the obligation of contract. (See 10, U.S. Constitution). But it is within the Sovereign power of the United States Government to do these acts if in its National interests it sees fit to do so.
The Courts of this Country can take judicial notice of treaties made between the U.S. Government and foreign governments. United States v. Reynes, 9 Haw. 127, 50 U.S. 127, 13 L.Ed. 74; Lacroix Fils v. Sarrazin, 5 Cir., 15 F. 489. Further, our Courts will take judicial notice of the Acts of Congress and presidential proclamations. Williams v. Windham, 3 La.App. 127; Powell-Myers Lumber Co. v. Tremont & Gulf Realty Co., 2 La.App. 164.
With these legal propositions before us, the Court must recognize and give effect to the Bretton Woods Agreement signed by the United States, Cuba, and some ninety-five sovereign Nations in 1945. Each signatory to the Compact, which included an International Monetary Fund, bound itself to take steps to implement the principles of the international accord, as part of its domestic law. Our own Congress honored its commitment by enacting a statute to that effect. (22 U.S.C.A. § 286 et seq.).
Article VIII, Sec. 2(b) of the Agreement, among other things, provided as follows:
"Exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member * * * shall be unenforceable in the territories of any member."
By accepting and implementing the above, our Congress has undertaken to make the above principle, a part of our national law. On June 14, 1949, the International Monetary Fund, binding on all its members, including Cuba and the United States, issued the following interpretation of Art. VIII, Sec. 2(b):
"An obvious result of the foregoing undertaking is that if a party to an exchange contract referred to in Article VIII, Sec. 2(b) seeks to enforce such a contract, the tribunal of the member country before which the proceedings are brought, will not, on the ground that they are contrary to the public policy of the forum, refuse recognition of the exchange control regulations of the other member which are maintained or imposed consistently with the Fund Agreement. It also follows that such contracts will be treated as unenforceable notwithstanding that under private international law of the forum is not the law which governs the exchange contract or its performance * * *."
*454 Cuban Law 568 of September 29, 1959, required payments between plaintiff and defendant be made in Cuba, regardless of the language of the contract. Despite this, plaintiff attempts to defy the decrees and laws of Cuba, the sovereign to whom he owed allegiance to come into this country and collect his debt in the currency of another nation. This would nullify and frustrate his own sovereign's legislative will and powers.
Prior to the Bretton Woods Agreement, plaintiff's position might have been upheld. Our Courts have held it to be the public policy of the forum State to refuse to give effect to exchange control legislation of a foreign sovereign, where such was labelled by the forum as penal, punitive, confiscatory or violative of fundamental concepts of justice. In this connection, the Court calls attention to the cases and authorities cited therein of Menendez Rodriguez v. Pan American Life Insurance Co., 5 Cir., 311 F.2d 429 and Menandez v. Aetna Insurance Co., 5 Cir., 311 F.2d 437.
This Court believes, and so holds, that the Bretton Woods Agreement and our Acts of Congress (22 U.S.C.A. § 286 et seq.) supersede the principles enunciated in the above authorities, as to parties or nations who signed the agreement or treaty. It is now our national policy to deny enforcement, in the Court of this land, of contracts which would frustrate the exchange control regulations of another member of the agreement. Our Congress gave recognition to the will of the signatories to the agreement, declaring that the public policy of its members would be better served by a measure of collaboration among them designed to give effect to each other's exchange control regulations. The U.S. Supreme Court, in Kolovrat v. Oregon, 366 U.S. 187, 81 S.Ct. 922, 928, 6 L.Ed. 218, decided May 1, 1961, interpreted the Bretton Woods Agreement as follows:
"These treaties and agreements show that this Nation has adopted programs deemed desirable in bringing about, so far as can be done, stability and uniformity in the difficult field of world monetary controls and exchange. * * * Doubtless these agreements may fall short of that goal. But our National Government's powers have been exercised so far as deemed desirable and feasible toward that end, and the power to make policy with regard to such matters is a national one from the compulsion of both necessity and our Constitution."
We find that the Court below disregarded the above treaty accord between the United States and Cuba and our own Congressional enactments to implement this agreement. Our Courts should not and cannot enforce a contract which transcends the sovereign will of Cuba touching on monetary contracts involving its own nationals. Plaintiff demands should have been rejected.
It must also be remembered that this defendant complied with the laws of Cuba in the operation of its Cuban Agency by maintaining reserves in Cuba to insure the payment of its Cuban obligations, including this policy. When the Castro government nationalized the insurance business, it took over those reserves and any other assets of this defendant in Cuba and went into the insurance business, of which this policy was a part. If this judgment by the trial court is enforced against this defendant in Louisiana, it will amount to a payment of the obligation twice, for the reason that this defendant cannot now withdraw the amount of the judgment from its reserves and assets in Cuba which reserves were put up to insure payment of this and other policies in Cuba.
While it may be more advantageous for plaintiff to have sought relief in the Louisiana Courts and to have urged the application of Louisiana law to the terms of the contract as originally written, the selection of the forum does not dictate *455 the application of the law of the forum; nor can the forum ignore the modifications of a contract by a sovereign government under its police powers and its domination over its citizens, especially when that sovereign government has been recognized by the Executive Department of the United States. There can be but one law applicable to this contract, and we hold that the present law of Cuba, which nationalized under Cuba's police powers the insurance business, including defendant's company, at a time when plaintiff was a resident and national of Cuba, is the applicable law.
The judgment of the District Court is reversed and plaintiff's suit is dismissed at his costs.
Reversed and rendered.
NOTES
[1] Buxton v. Mid-Western Insurance Co., D.C., 102 F.Supp. 500; Lewis v. Manufacturers Casualty Insurance Company, D.C., 107 F.Supp. 465; Boring et al. v. Louisiana State Insurance Company, 154 La. 549, 97 So. 856; Strauss v. New York Life Insurance Co., 204 La. 202, 15 So.2d 61.
[2] This policy became a paid-up policy in the year 1942, at the election of plaintiff.