Inocencio BLANCO, Plaintiff,

v.

PAN–AMERICAN LIFE INSURANCE COMPANY, Defendant,

PAN–AMERICAN LIFE INSURANCE COMPANY, Counter-Claimant,

v.

Inocencio BLANCO et al., Counter-Defendants.

Guido CONILL, Plaintiff,

v.

PAN–AMERICAN LIFE INSURANCE COMPANY, Defendant.

Jose Antonio LORIDO Y DIEGO, Plaintiff,

v.

AMERICAN NATIONAL INSURANCE COMPANY, Defendant.

Maria Teresa Paula AGUIRREGAVIRIA ZABALETA, Plaintiff,

v.

PAN–AMERICAN LIFE INSURANCE COMPANY, Defendant.

Civ. Nos. 11130, 24–62, 194–62, 63–3.

United States District Court
S. D. Florida.
July 15, 1963.

Carey, Goodman, Terry, Dwyer & Austin, Herbert A. Kuvin, Miami, Fla., for plaintiffs Blanco, Conill and Diego.

Salley & Paul, Miami, Fla., for plaintiff Zabeleta.

Dixon, DeJarnette, Bradford, Williams, McKay & Kimbrell, Miami, Fla., for defendants.

CHOATE, District Judge.

The four above captioned causes were consolidated for trial, and the Court has heard and considered the testimony and the evidence of the respective parties. Trial by jury was not demanded [on] any issues in the causes by any of the parties, and the Court now enters its Findings of Fact and Conclusions of Law, pursuant to Rule 52(a).

## STATEMENT AND FINDINGS OF FACT

Each of these causes involves an action by the plaintiff on certain policies of life insurance or annuity for declaratory judgment that the policies sued on are in full force and effect, and that where applicable the cash surrender value thereof is payable upon demand, or where there are annuity or endowment features that same will be paid as the sums provided for mature. In the one case, (Blanco) there is a counterclaim for declaratory judgment that the insurance company defendant is not liable upon the three annuity contracts.

In each case, federal jurisdiction is invoked upon the grounds of diversity of citizenship and the fact that in each case the amount in controversy exceeds Ten Thousand Dollars exclusive of interest and costs. All of these cases were originally filed in the Circuit Court of Dade County, Florida, and were removed to this Court, on the petition of the Defendants, which petition was predicated upon diversity of citizenship. Each of the plaintiffs are former nationals of Cuba, and are residents of Florida The

defendant, Pan-American Life Insurance Company (hereinafter referred to as Pan American), is a corporation organized and existing under the laws of the State of Louisiana and having its principal place of business in the City of New Orleans, Louisiana. The defendant, American National Insurance Company (hereinafter called American National), is a corporation organized and existing under the laws of the State of Texas, and having its principal place of business in the City of Galveston, Texas.

Pan-American had been conducting a life insurance business in the Republic of Cuba since 1913 and continued so doing until October 26, 1960, and maintained a branch office in Havana, Cuba, during this period.

American National had been conducting a life insurance business in the Republic of Cuba since about 1949 and continued so doing until October 24, 1960. During this time, American National had a general agent in Havana, Cuba, known as the Godoy-Sayan.

### The Blanco Annuity Policies

On May 18, 1945, Inocencio Blanco (hereinafter called Blanco) purchased from Pan-American three separate single-premium annuity contracts on the respective lives of his three daughters.

The first of these policies was a lifetime annuity policy No. 400–266 wherein it was agreed, among other things, to pay to one Gloria Maria de la Milagrosa Blanco y Diez, the daughter of the Plaintiff, for a cash consideration of $18,-084.00, a lifetime annuity in the amount of One Hundred Dollars a month, the first payment to be effected on the 18th day of May of 1965. The second was a lifetime annuity policy No. 400–267, wherein it agreed, among other things, to pay to one Ana Maria Blanco y Diez, the daughter of the Plaintiff, for a cash consideration of $20,323.00, a lifetime annuity in the amount of $100.00 a month, the first payment to be effected on the 18th day of May, 1961. The third was a lifetime annuity policy No. 400–268, wherein it agreed, among other

things, to pay to one Maria de Lourdes Blanco y Diez, the daughter of the Plaintiff, for a cash consideration of $22,-889.00, a lifetime annuity in the amount of $100.00 a month, the first payment to be effected on the 18th day of May, 1957.

Inocencio Blanco Arias, the father of the annuitant, is living and is vested with the control of the contract under its terms, and the Plaintiff has complied with all conditions precedent contained in the policy, including the payment of all premiums due thereunder.

The Plaintiff, Inocencio Blanco, has made demand for the cash value of the policy as prescribed by the terms of the policy, and the said demand was refused by the defendant insurance company.

The annuity contract on the life of Maria de Lourdes Blanco y Diez matured on May 18, 1957, and Pan-American began to pay her the monthly installments of $100.00 called for by the said contracts. Said payments continued to be made until and including August 18, 1960. Prior to this last mentioned date, Pan-American had no knowledge that this annuitant had become a naturalized Cuban citizen. Shortly after August 18, 1960, Pan-American learned for the first time that this annuitant had become a Cuban citizen and on or about September 18, 1960, issued its check payable to her in the amount of 100 Cuban pesos and mailed it to her at her last known address in Cuba. This check was returned (by Sr. Blanco) to Pan-American on September 19, 1960, and before the due date of the installment for October, 1960, Pan-American was advised that this annuitant would not accept further payments in pesos or in Cuba. No further payments have been made to this annuitant. All other payments made to this annuitant were made in United States dollars.

The annuity contract on the life of Ana Maria Blanco y Diez matured on May 18, 1961, and no payments have been made on account thereof.

The annuity contract on the life of Gloria Maria de la Milagrosa Blanco y Diez does not mature until May 18, 1965, and no payments on account thereof have become due.

### The Conill Policy

Shortly before December 20, 1941, the plaintiff applied to the defendant's office in Havana, Cuba, for the issuance to him of a policy of life insurance by the defendant.

The policy, No. 359–012 was issued and agreed, among other things, to pay to his named beneficiary, for a cash consideration of the advance payment of $972.00 and a like sum each and every year during the term of the policy, the amount of $20,000.00 upon proof of the death of Guido Conill.

Guido Conill is living and is therefore vested with the control of the said policy, and the Plaintiff has complied with all the conditions precedent contained in the policy, including the payment of all premiums due thereunder.

The plaintiff, Guido Conill, has made demand for the cash value of the policy, as prescribed by the terms of the policy, and the said demand was refused by the defendant insurance company.

### The Aguirregaviria Zabaleta Policy

On or about May 28, 1938, the plaintiff applied to the defendant's office in Havana, Cuba, for the issuance to her of a policy of life insurance by the defendant.

The policy, No. 315,761, was issued and provided various life insurance and endowment benefits as well as other options which plaintiff could elect. It had a maturity value of $14,550.00 and had various cash values, depending on the length of time that the policy was in effect which were provided in a table of options contained in the policy.

On or about July 14, 1952, the plaintiff entered into an agreement with the defendant, which became a part of the said policy of insurance. By the terms of this agreement, policy payments to or by the plaintiff were to be made in Cuban pesos, and the place of payment was to be in Havana, Cuba. Thus, from the in-

ception of the policy to 1952, the plaintiff paid premiums to the defendant in United States dollars. From 1952 to on or about October 24, 1958, the plaintiff paid premiums in Cuban pesos pursuant to this agreement. On October 24, 1958, in accordance with the provisions in the policy, plaintiff exercised one of the options granted thereunder and elected to cease paying annual premiums and receive Fifteen (15) years thereafter an endowment payment. Her election was agreed to in writing by the defendant.

Having complied with all conditions precedent contained in the policy, the plaintiff, on or about July 30, 1962, made demand upon the defendant for the cash value of the policy. The defendant refused to pay same and further refused to consider the policy in full force and effect despite plaintiff's compliance with all the conditions precedent contained therein.

### The Diego Policies

On July 11, 1950, the plaintiff made application to Godoy-Sayan for the issuance to him of a policy of life insurance by the defendant, and on July 16, 1951, the plaintiff made application to Godoy-Sayan for the issuance to him of a second policy of life insurance by the defendant.

Each of said applications contained a provision which, translated into English, is as follows:

"Any policy of insurance issued upon this application will be considered a contract of the State wherein such application was written and the policy terms shall be construed in accordance with the laws of such State and unless otherwise specified herein by the applicant."

On the first application, Endowment Insurance Policy No. 1455500 was issued and it agreed, among other things, to pay to the Plaintiff, if living, or to his specified beneficiary, on the Endowment Maturity Date of the Policy the sum of $5,000.00, or the equivalent thereof.

On the second application, Endowment Insurance Policy No. 1566141 was issued and it agreed, among other things, to pay to the Plaintiff, if living, or to his specified beneficiary, on the Endowment Maturity Date of the Policy, the sum of $5,000.00 or the equivalent thereof.

Jose Antonio Lorido y Diego, the Plaintiff, is living and is therefore vested with the control of the contract as enumerated in the foregoing paragraph, and the Plaintiff has complied with all conditions precedent contained in the policy, including the payment of all premiums thereunder.

The Plaintiff had made demand for the cash value of the policy as prescribed by the terms of the policy, and the said demand was refused by the defendant insurance company.

### Common Findings in All Causes

All plaintiffs are Cuban nationals residing in Florida in this district and are stipulated to be refugees from Castro's Cuba.

Excepting an initial deposit of $25,-000.00, there was no requirement that the defendants maintain or invest any assets in Cuba.

There were no provisions in any of the contracts of insurance here sued upon that the claims of the policyholders would be paid solely from the assets of either of the defendants located in Cuba. On the contrary, the court finds that the total assets of the insurance company were pledged to the payment of these contracts regardless of their location.

The applications for all of the above-mentioned five policies were made in Cuba and in the Spanish language. In each case, the applications were sent to the American home office of the insurance company involved. They were there accepted and the policies issued. The Pan American policies were issued in the Spanish language, and the American National policies were issued in the English language. After issuance, each policy was forwarded to the Cuban agent of the respective insurance company and was taken by him before a Cuban No-

tary who authenticated the signatures of the company officers. Then each policy was delivered to the policyholder in Cuba. The initial premiums of all the Pan-American policies were in dollars. Except as modified in the case of the *Zabaleta* policies as discussed above, all of the Pan-American policies provided that all payments, either of premium or benefit, were to be made in New Orleans, Louisiana. The Cuban peso was the designated currency in the American National policies, but the payment of premium and benefit was to be in Galveston, Texas. None of the policies had any restrictions as to residence, travels and occupation, and in the case of the Pan American policy, such exemption was specifically set forth.

In 1948, the Republic of Cuba enacted Law No. 13, which provided for the creation of the National Bank of Cuba. Said law also provided for the subsequent issue of an executive Resolution fixing a date after which the U. S. dollar would cease to be legal tender in Cuba and the Cuban peso would be the sole legal tender in Cuba. However, there was no indication that said law was to have extra-territorial effect.

On January 1, 1959, the government headed by Fidel Castro came into power in Cuba, and on or about January 5, 1959, the United States extended diplomatic recognition to that government. Such diplomatic recognition has continued to the present time.

On or about September 29, 1959, the Republic of Cuba enacted Law No. 568, and on June 6, 1960, the Republic of Cuba enacted Law No. 851. Then, on October 24, 1960, the Republic of Cuba, in pursuance of said Law No. 851, promulgated Resolution No. 3.

On October 26, 1960, in pursuance of said Resolution No. 3, the Republic of Cuba forcibly expropriated Pan-American and American National's agency operations and seized all of their assets in Cuba and took over their office and records located in Cuba.

None of the plaintiffs had applied for or received a permit from the National Bank of Cuba for the payment to them of any benefits under said annuity contracts in U. S. dollars in this country. However, none was required to be obtained since the currency restrictions involved have no extra-territorial application. The official exchange rate at all times pertinent to this litigation was one peso for one dollar.

On December 18, 1962, the Republic of Cuba notified the International Monetary Fund, in accordance with Art. XIV, Section 3, that it accepted the obligations of Art. VIII, Sections 2, 3 and 4 of the Articles of the Fund.

There is no requirement in the Articles of Agreement of the International Monetary Fund that a member of the Fund must also be of the International Bank for Reconstruction and Development. Cuba has remained a member of the Fund notwithstanding its withdrawal from membership in the Bank.

Cuban Law No. 568 has not been the subject of a specific decision of the Executive Directors of the Fund. In the recent past, the Executive Directors have authorized the following statement regarding the exchange system of Cuba:

"A member of the Fund, like Cuba, which has accepted the obligations of Article VIII, is required to obtain Fund approval of exchange restrictions on current transactions, multiple currency practices and discriminatory currency arrangements pursuant to Article VIII, Sections 2 and 3 of the Fund's Articles of Agreement. The Fund has approved the maintenance by Cuba of a two per cent exchange tax on remittances abroad. Any other existing restrictions on current transactions, multiply currency practices or discriminatory currency arrangements do not have the Fund's approval."

"In accordance with the Articles of Agreement, Fund approval for

controls of capital transfers is not required. Thus, to the extent any controls are confined to capital transfers, they are maintained or imposed consistently with the Fund's Articles of Agreement."

On January 7, 1959, the Government of the United States recognized the Government under the Presidency of Dr. Manuel Urrutia Lleo, as the provisional Government of the Republic of Cuba. On January 3, 1961, the Government of the United States severed diplomatic and consular relations with the Government of Cuba. This action did not constitute a cessation of recognition of the Government of Cuba. The United States has recognized without interruption, and continues to recognize, as the Government of Cuba, the Government of which Fidel Castro is Premier.

Under Cuban law, the effect of Law No. 13 of *1948*, and Resolution No. 1384 issued in pursuance thereof, was to make all pre-existing Cuban contracts payable and demandable only in Cuban pesos, if they were to be performed within the territorial limits of Cuba.

Under Resolution No. 3 of October 24, 1960, promulgated under the authority of Law No. 851 of July 1960, the Republic of Cuba substituted itself as the obligor on the debts and obligations of the companies, and the persons whose properties were expropriated by Section 1 of that resolution within Cuba.

At least insofar as the obligations of the life insurance companies which were expropriated by Resolution No. 3, the Republic of Cuba, up to at least the month of July, 1962, was actually performing within Cuba the policy obligations of the expropriated American Life insurance companies, *except* to policyholders whose names were on a "black list" which was political in nature.

The evidence indicated that before the Castro seizure the properties of Pan-American Life Insurance Company which were seized amounted in value to 103% of the reserves against outstanding policies issued by it in Cuba. No similar evidence was presented by American National Insurance Company.

In each of these causes the parties have stipulated that the Court could, if any of the plaintiffs prevail, set the amount of attorneys' fees to be awarded without benefit or aid of testimony on the part of either party.

The Court finds that the plaintiffs are entitled to an award as and for a reasonable attorneys' fee in each case as follows:

| | |
|---|---|
| In the Blanco case, | $9,000.00; |
| In the Conill case, | $2,500.00; |
| In the Zabaleta case, | $1,818.75; |
| In the Diego case, | $1,250.00. |

Except for Pan-American Policy No. 400–268, there has been no tender under any of these policies in Cuba or elsewhere in dollars or in pesos.

## OPINION AND CONCLUSIONS OF LAW

By pre-trial stipulation the issues of law presented to this Court upon remand of the case for trial are the same as those succinctly stated by the Circuit Court of Appeals in Pan American Life Ins. Co. v. Blanco, 311 F.2d 424 (5th Cir. 1962) as follows:

(Whether or not) " * * * Pan American is relieved of liability and performance of its obligations under the contracts by reason of certain Cuban laws and decrees, referring to: (1) Cuban Law No. 13 of 1948 and Cuban Monetary Decree of 1951 under Law No. 13, which Pan American alleged 'required all contracts theretofore payable in dollars to or by Cuban nationals in Cuba to be payable in Cuban pesos', (2) Cuban Law No. 568 of September 29, 1959, which Pan American alleges prohibited the defendant from paying any monies to Cuban nationals anywhere except in Cuba, (3) Cuban Law No. 851 of July 6, 1960 and Cuban Resolution No. 3 of October 24, 1960 under Law No. 851 'which in substance and effect' expropriated the Cuban assets of Pan

American 'and substituted the Cuban government as the obligor' in 'the annuity contracts herein sued on'."

The pre-trial stipulation states the issue in terms of whether or not the court is required to recognize and give effect to these Cuban decrees and laws either under our municipal law or under the two Bretton Woods Agreements and 22 U.S.C. § 286 et seq., Acceptance of Membership by United States in International Monetary Fund.

█ █ The law of the case has been established in part upon appeal in the Blanco case cited above. The Court of Appeals declared that

"Our courts are not compelled by the Act of State Doctrine to give force and effect to the decrees of the Castro government in Cuba."

The appellate court's statement is predicated upon a finding that the Cuban decrees involved were confiscatory and violative of the principles of international law and thus without status in our courts. This court finds that the Cuban decrees of expropriation which might otherwise have disputable validity in international law were directed in a discriminatory fashion at the United States and its citizens, and the decrees themselves speak plainly in terms of "cold war". See the prologue to Law 851, Nationalization Law and see Banco Nacional De Cuba v. Sabbatino, 307 F.2d 845 (2nd Cir. 1962) cited in the Blanco case.

█ Neither the Rules of Decision Act nor the doctrine of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, are applicable to the principal issues in these cases. Although the jurisdiction of the Court is grounded on diversity, the defense posed by the insurance companies is one based on federal statutes and treaty, international law and Cuban law.

█ The futility of an appraisal of these matters by choice of law rules is exemplified by the two lower state court decisions, one of Florida and the other of Louisiana, brought to our attention since this matter was tried and came under submission. On May 7, 1963, the Florida District Court of Appeal for the Third District in Pan-American Life Insurance Co. v. Recio, 154 So.2d 197, determined that the place of performance governed the contract. On this basis, the Florida Court, in a case almost identical to those before this Court, held for the plaintiff-policyholder. Under Erie v. Tompkins and Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this Court would be directed to look to the law of Louisiana and Texas for the applicable substantive law applying the conflicts rule of Florida, the forum state. However, while cited to no Texas case, and none presumably exist, we are cited to Theye Y Ajuria v. Pan American Life Insurance Co., 154 So.2d 450, decided by the Court of Appeal for the Fourth Circuit, State of Louisiana. This court held for the insurance company on similar facts (accepting the defendants' contentions as made here almost in toto) and said that the law of Cuba governed the decision. The intermediate Louisiana court was not deciding the matter on Louisiana law but on its interpretation of the Bretton Woods agreement, the United States recognition of the present Cuban government, and 22 U.S.C. § 286 et seq. Thus, if we apply Klaxon Co. v. Stentor Electric Mfg. Co., we come full circle back to a determination of federal and international law. Unmistakably, a federal court sitting in diversity is not bound by state decisions in interpreting federal questions.

The evidence in the case makes it clear that our domestic insurance companies needed only deposit $25,000.00 in Cuba in order to do business in Cuba. No interdependence is shown between the defendants' investments in Cuba and the plaintiff's contracts.

The central issue in this case is the contention of the defendant insurance companies that their performance under these contracts should be excused because of the expropriation and national-

ization of their Cuban operations and assets. The defense raised by virtue of reliance upon the monetary restrictions are clearly not an excuse for total breach of the contracts since no tender of payment either in Cuba or the United States in pesos or in dollars has been shown. Similarly, no attempted tender of payment in Cuba or in pesos has been shown which might lead to a plea of impossibility or frustration, except in the one matured Blanco annuity which was clearly a dollar contract.

■■ Not only is this court not required to give recognition to the described acts of the present Cuban government, but the Castro decrees have no extra-territorial effect, Cunard S. S. Co. v. Mellon, 262 U.S. 100, 101, 43 S.Ct. 504, 67 L.Ed. 894 (1923); Exchange v. M'Faddon, 11 U.S. 116, 3 L.Ed. 287 (7 Cranch) (1812). We are of the opinion that neither the persons nor the subject matter of this action is subject to the sovereignty of the present State of Cuba.

■ This conclusion is compelled by the finding above that the assets of the defendants within Cuba bore no relationship to the transitory causes of action involved here, and obviously the domestic insurance companies are not subject to the sovereignty of the present State of Cuba. However, throughout the pleading and trial of this case, it has been apparent that the defendants (and perhaps the plaintiffs) have assumed that since the plaintiffs were Cuban nationals by origin that they were subject in personam to the sovereignty of the State of Cuba, and bound by the municipal law of Castro's Cuba. Inasmuch as the parties have stipulated that the plaintiffs in each of these cases are "refugees" from that government and are at present alien inhabitants of the United States, this reasoning would seem to be misconceived. The political refugee is a notable twentieth century contribution to the category of *res nullius*. See 1 Schwarzenberger, A Manual of International Law 132 (4th ed. 1960).

■ As far back as Blackstone it has been recognized that citizenship is not comprised of birth or by naturalization alone. There must also be "ligeance" to the sovereign, United States v. Wong Kin Ark, 169 U.S. 649, 659, 18 S.Ct. 456, 42 L.Ed. 890 (1897). Allegiance is the obligation of fidelity and obedience which the individual owes his government in return for the protection which he receives. It may be renounced by an open and distinct act, Carlisle v. United States, 83 U.S. 147, 154, 21 L. Ed. 426 (16 Wall.) (1872). For examples of acts held to effect expatriation in United States law see 3 Moore, Digest of International Law 711, et seq., Sec. 466. Certainly, the flight of Miami's Cuban refugees from Castro's Cuba, their acceptance by the United States and our encouragement and support through the agencies of our executive and legislative branches is evidence of their renunciation of the present sovereignty of Cuba. These are matters properly within the judicial notice of this Court.

The plaintiffs are alien residents of the United States. In discussing the situation of a national non-citizen in the United States, H. F. Van Panhuys, The Role of Nationality in International Law (Leyden, A. W. Sythoff, 1959) discusses the case of the Cayuga Indians who moved from New York State to Canada. In an arbitral award of January 22, 1926, between the United States and the United Kingdom, these emigrants were held to have become British Nationals, apparently solely on the ground of the transfer of their living quarters. The author made the following statement:

"(1) that a State may have more than one people living together on the same soil, (2) that in the absence of clear statutory provisions the status of a national must sometimes be established on the merits of the factual situation, (3) that in such circumstances, great significance must be attached to the place where the "people" is settled, and

(4) that nationality and citizenship do not necessarily coincide."

 These former political citizens of a Cuba that has ceased to be (with some inchoate allegiance to a Cuba they hope may come into existence sometime in the future) are at present political citizens of nowhere. They are, however, civil citizens of Florida based on their domicil here, and they are possessed of our municipal rights and obligated for domestic municipal duties, 169 U.S. 656, 18 S.Ct. 459.

All of the contracts involved in these cases have in common (1) an offer made in Cuba with (2) acceptance of same by issuance of the policy in the United States. It is true that the policy in each case was then transmitted back to Cuba where an agent of the insurer completed an authentication of the signatures of the United States officers of the insurance companies. This authentication, however, was a mere ministerial act. With two exceptions which will be noted, the contracts uniformly called for payment of dollars and specified that all payments either of premium or benefit take place in the United States at the home offices of the respective companies. Similarly, recognition of assignments, changes of beneficiary, modification of terms, proofs of death, all had to be accomplished within the United States. None of the policies were restricted as to residence of the insured.

In 63–3–M–Civ.–EC, involving Pan American policy, 315–761 issued to plaintiff Aguirregaviria Zabaleta, there was an endorsement varying the above. The policy in force since 1938 was amended in 1952 to provide for the payment of premium and benefits *in Cuba* in pesos. However, by the terms of the endorsement, the contract expressly provided for one peso to one dollar ratio. Both this amendment and a subsequent one in 1958 providing for paid up insurance were effected in New Orleans.

The two American National policies involved herein called for payment of both premiums and benefits in Galveston, Texas, but specified pesos.

In this regard, the Court has found that the intent of the parties in these peso transactions was payment at the official exchange rate of one peso for one dollar, and that the product of black market transactions were not contemplated as a basis of payment (There was evidence of minor dealings in pesos in Miami at greatly depressed prices).

 As we have indicated previously, the question of insurance companies excuse for non-performance is a question of federal and international law, nevertheless the question of breach and remedy is one which is governed by state law. It is true that by applying traditional choice of law rules a strong argument can be made for the proposition that these contracts are governed by Cuban law. However, the modern view dictates that the Court will protect insureds from the greater power of insurors by means of its choice of law rules. Thus, the drafters' comment contained in Restatement of the Law, Second, Conflict of Laws, Ch. 8, Contracts, Tentative Draft No. 6 (1960) in Section 346h, Life Insurance Contracts at 108–09 points out that normally the validity of a life insurance contract is governed by the local law of the state where the insured was domiciled at the time the policy was issued. However, if the contracts which the contract has with another state are sufficient to establish a more significant relationship between the contract and the other state, the local law of the other state will govern. It is significant that the reason underlying the choice of law rule is *to allow the maximum protection of the insured.* Applying this reasoning, the Court finds that these are contracts governed by the law of the domicile of the insurors which is consistent with the result reached by the Florida District Court of Appeal in the Recio case by application of a place of performance test. The endorsement in the Zabaleta case might create an exception to this statement if a choice of law rule was determinative of result.

 However, the choice of law is not necessary to a determination of

this cause. Whether under the common law or under the civil code, there has been a breach of the contract unless the expropriation and nationalization of the carriers is recognized and given extra-territorial effect. The Court is satisfied that such recognition and extra-territorial effect should not be given these acts. Public Law 13 and Decree No. 1384 on their face does not purport to have extra-territorial effect, and the expert testimony upon Cuban law agrees with this conclusion. Both specifically limit themselves to the territorial limits of Cuba. Even Law No. 568 (another product of the Castro regime), does not appear on its face to cover the situation here. Even if the court is mistaken as to the National status of the plaintiffs as refugees, these laws do not apply to cover the situation of a Cuban national enforcing an executory contract in the forum of another jurisdiction according to the terms of an obligation existing prior to the passage of those laws. Further, we do not believe that such laws and decrees can have any force and effect over the persons of these litigants who are not only without Cuba, but, as refugees, are not subject to its in personam jurisdiction. The question of due process does not enter into the cause, See, c. f., Sun Insurance Office, Ltd. v. Clay, 319 F.2d 505 (5th Cir., June 19, 1963). On the basis of the foregoing, The Bretton Woods Agreement and 22 U.S.C. § 286 et seq., would not appear to have any applicability.

We find that the remedy in each case should be governed by Louisiana and Texas law, and in the absence of proof to the contrary, the Court will presume that it is the same as the forum.

Thus, in the Blanco cases where the relief sought is that of damages for the past due installments on the three annuity contracts, plus declaratory relief that the contracts are in full force and effect to be paid in United States Dollars in the United States, the Court has no difficulty in granting same. The Blanco cases involve single premium annuity contracts paid in dollars and calling for payment in dollars at New Orleans.

The Conill contract was a 25 year term ordinary life, and declaratory relief that the policy was in full force and effect was sought. This policy, like the Blanco, is a dollar contract and calling for payment in New Orleans. Conill is entitled to the relief sought.

The Zabaleta case differs in that the original terms of the policy pertinent here were the same as those discussed above. However, in this case, the insured agreed to payments of premium and benefits in pesos *in Havana*, Cuba, and same was made a part of the policy of insurance by endorsement. However, as indicated previously, this same endorsement called for a payment of pesos from dollars on a one-to-one basis. No tender of pesos in Havana has been shown, and the Court concludes, on the basis of the foregoing, that the contract has been breached, and the plaintiff is entitled to receive the equivalent of pesos due in United States Dollars at the rate of one for one which was the contractual rate contemplated by the parties and the official exchange rate as shown by the evidence, both at time of breach and time of judgment. See Anglo-Continentale Treuhand, A. G. v. St. Louis Southwestern R. Co., (2d Cir. 1936), 81 F.2d 11, 105 A.L.R. 636, cert. denied, Henwood v. Anglo-Continentale Treuhand, A. G., 298 U.S. 655, 56 S.Ct. 675, 80 L. Ed. 1381 (1936).

In the Diego case, the contract was made payable in pesos at Galveston, Texas, U.S.A. On the basis of the foregoing, the Court is of the opinion that the plaintiff is entitled to the relief sought at the official exchange rate of one peso for $1.00 American, and that the same is payable per the terms of the policies in Galveston, Texas.

In each of these cases, counsel stipulated to the recovery of attorneys' fees on the basis of Florida Statute, § 627.-0127, F.S.A. as fixed by the Court, and

decree will be entered upon the stipulation in accordance with the findings herein.

Counsel shall submit form of Judgment in accordance herewith.